IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MODERN AUTOMOTIVE NETWORK, LLC )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>EASTERN ALLIANCE INSURANCE )<br>COMPANY d/b/a EASTERN ALLIANCE )<br>INSURANCE GROUP, EASTERN )<br>ADVANTAGE ASSURANCE COMPANY, )<br>d/b/a EASTERN ALLIANCE INSURANCE )<br>GROUP, and ALLIED EASTERN )<br>INDEMNITY COMPANY d/b/a EASTERN )<br>ALLIANCE INSURANCE GROUP )<br>)<br>Defendants. ) | 1:17CV152 |

## MEMORANDUM OPINION AND ORDER

Loretta C. Biggs, District Judge.

Before the Court are Defendants' Motion for Summary Judgment, (ECF No. 32),

Plaintiff's Motion to Strike, (ECF No. 35), and Defendants' Motion in Limine, (ECF No. 49).

For the reasons stated below, the Court will grant Defendants' motion for summary judgment

and motion in limine; and will grant in part and deny in part Plaintiff's motion to strike.

## I.    BACKGROUND

This action arises out of an insurance dispute between Plaintiff, Modern Automotive

Network, LLC ("Modern") and Defendants, Eastern Alliance Insurance Company ("EAIC"),

Eastern Advantage Assurance Company ("EAAC"), and Allied Eastern Indemnity Company

("AEIC"), each individually and collectively d/b/a Eastern Alliance Insurance Group

("Eastern"). Modern obtained a workers' compensation insurance policy (the "Policy") from EAIC for the period from January 1, 2015 to January 1, 2016. (ECF No. 4-1 at 2.) Under the Policy, EAIC had the "right and duty to defend" any claim against Modern that is covered by the Policy. (*Id.* at 8.) EAIC also had "the right to investigate and settle these claims, proceedings or suits." (*Id.*) The Policy had a $250,000 deductible for each claim, and a yearly aggregate deductible of $425,000. (*Id.* at 24.) The parties also entered into a Deductible Reimbursement and Security Agreement ("Deductible Agreement"), which set out the terms by which Eastern would pay for the claims and Modern would reimburse Eastern for the deductible amount. (*See* ECF No. 4-2.) Modern's claims in this lawsuit arise out of Eastern's handling of three workers' compensation claims: "Mr. G," "Mr. H," and "Mr. S." (*See* ECF No. 4.)

Because all final settlements of any workers' compensation claims must be approved by the North Carolina Industrial Commission,[1] Eastern hired a North Carolina law firm, McAngus Goudelock & Courie ("McAngus"), to draft the settlement agreement for Mr. H's claim and to obtain approval from the Industrial Commission for the settlement of that claim. (*See* ECF No. 33-2 ¶ 3.) Eastern also engaged McAngus to handle some portion of Mr. S's claim.[2] (*See* ECF No. 39-3 at 17, 24.) After the settlements for these claims had been finalized, Modern, on September 30, 2016, asked McAngus to provide it copies of the file for Mr. H's claim, (ECF No. 39-4 at 20), and later requested copies of Mr. S's file, (ECF No. 39 at 20–21; ECF No. 39-4 at 5). Modern also requested that Eastern provide its files on all three claims.

---

[1] *See* N.C. Gen. Stat. § 97-17.
[2] It was unclear from the record whether McAngus handled part of Mr. G's claim.

(ECF No. 39-4 at 21.)  The files appear to have been provided to Modern sometime between January 12, 2017 and March 3, 2017.  (*See id.* (Modern requesting all three files) and *id.* at 22 (McAngus providing Mr. H's file to Modern pursuant to a subpoena).)

Defendants now move for summary judgment on all of Plaintiff's claims which include state law claims of breach of contract, negligent claims handling, and unfair and deceptive trade practices.  (*See* ECF No. 32 at 1–2.)  Because Plaintiff has moved to strike certain evidence from consideration by this Court in resolving the summary judgment motions, the Court will first address Plaintiff's motion to strike.  *See Jarrell-Henderson v. Liberty Mut. Fire Ins. Co.*, No. 2:07cv432, 2009 WL 347801, at *6 (E.D. Va. Feb. 10, 2009) ("Preliminarily, the court must decide Plaintiff's motion to strike the affidavit of [a witness], offered in support of [Defendant's] response to Plaintiff's motion for summary judgment.").

## II.    PLAINTIFF'S MOTION TO STRIKE

Plaintiff's motion to strike seeks to have this Court strike the declarations of Thomas A. French, (ECF No. 33-1), and Jack S. Holmes, (ECF No. 33-2). (ECF No. 35.)

### A.  Declaration of Thomas A. French

Thomas A. French is a Pennsylvania attorney who represented Eastern in connection with this matter.  (ECF No. 36 at 3; ECF No. 33-1 ¶¶ 2, 5.)  Modern argues that the Court should strike Mr. French's declaration which was submitted as part of Eastern's summary judgment filings because he was not listed on Eastern's initial disclosure of potential witnesses, pursuant to Federal Rule of Civil Procedure 26(a)(1), and because he was listed as one of Eastern's counsel of record at the time his declaration was filed.  (ECF No. 36 at 3–6.)  Eastern responds that the Court should consider French's declaration because Modern knew that

French was "mentioned by name in its Complaint," and further knew that "he had information relevant and material to the lawsuit." (ECF No. 43-2 at 2.) In addition, Eastern also argues that French's tardy withdrawal as counsel of record was a "good faith mistake." (*Id.* at 3.)

When a party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37(c)(1) provides trial courts wide discretion to remedy violations of Rule 26(a) or Rule 26(e). *See id.* In exercising its "broad discretion," a trial court may determine whether a party's violation of Rule 26(a) was "substantially justified or harmless" by considering:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

Considering the factors outlined by the Fourth Circuit, Eastern's failure to list Mr. French as a potential witness does not appear to be "substantially justified or harmless." *See S. States*, 318 F.3d at 597. Modern's claim that it was surprised when Mr. French's declaration was submitted as a part of Eastern's summary judgment filings, (ECF No. 36 at 4), was reasonable since French at the time of the filing remained counsel of record and as such could not, consistent with Rules of Professional Conduct, also serve as a witness in the case.[3] *See* N.C. Rules of Prof'l Conduct 3.7(a) (attorneys are not allowed to serve as witnesses in a trial

---

[3] All attorneys practicing before the Middle District of North Carolina are required to comply with the North Carolina Rules of Professional Conduct. L.R. 83.10e(b).

in which they are also an advocate). Further, when Modern reached out to Eastern's counsel in September 2018—weeks before Mr. French submitted his declaration—to determine whether Eastern intended to call French as a witness, Eastern failed to respond. (ECF No. 35-4 at 2, 5.) Modern has thus shown that it was substantially surprised when Eastern filed the French declaration while he remained counsel of record. In addition, Modern has shown that it was harmed by Eastern's failure to comply with Rule 26, which caused it to lose the opportunity to depose Mr. French. (*See* ECF No. 46 at 1–2.) Further, Eastern's "explanation for its failure to disclose" Mr. French as a potential witness in its Rule 26 disclosures is not persuasive. *See S. States*, 318 F.3d at 597; (*see* ECF No. 43 at 2–3). Nor can this Court conclude that Mr. French remaining as counsel of record until after the declaration was filed, was merely a "good faith mistake." (*See* ECF No. 43 at 3.)

This Court, having determined that Modern has demonstrated that Eastern's violation of Rule 26(a) in this instance was neither justified nor harmless will, in its discretion, strike the declaration of Thomas A. French, (ECF No. 33-1).

## B. Declaration of Jack S. Holmes

Modern next argues that the Court should strike the declaration of Jack Holmes, (ECF No. 33-2). (ECF No. 35 at 1.) Mr. Holmes was an attorney at McAngus who handled Mr. H's claim before the Industrial Commission. (ECF No. 33-2 ¶¶ 2–3.) Although Mr. Holmes was listed in both parties' initial disclosures of potential witnesses, (ECF No. 35-3 at 4; ECF No. 43 at 3), Modern argues that Mr. Holmes, in his declaration, provided expert testimony, which was not disclosed. (ECF No. 36 at 10–11.) Eastern argues in response that Mr.

Holmes's testimony was not expert testimony because it was "based on his personal experience and involvement with Mr. H's claim." (ECF No. 43 at 4.)

Federal Rule of Evidence 702 governs testimony by expert witnesses that is based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). Rule 701, however, allows a lay witness to give opinion testimony that is "rationally based on the witness's perception" and helpful to determining a fact in issue, so long as it is not based on the same "scientific, technical, or other specialized knowledge" covered by Rule 702. Fed. R. Evid. 701. "And while the line between the two . . . can be 'a fine one,' the key to Rule 701 lay opinion testimony is that it must arise from the personal knowledge or firsthand perception of the witness." *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017) (quoting *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006)). For example, in *MCI Telecommunications Corp. v. Wanzer*, the Fourth Circuit held that a bookkeeper should be allowed to testify regarding a projection of profits that she prepared "predicated on her personal knowledge and perception." 897 F.2d 703, 706 (4th Cir. 1990); *see also Bluiett v. Pierre M. Sprey, Inc.*, No. AW-05-1244, 2009 WL 10685350, at *4 (D. Md. Jan. 27, 2009) ("[W]itnesses with technical or other specialized knowledge can provide testimony under Rule 701 under circumstances where the testimony is directly related to the factual matter before the Court and not based on expertise.").

Mr. Holmes, in his declaration, stated that he reviewed Mr. H's file, including his medical records and other materials sent by Mr. Berger, Eastern's adjuster, for the purpose of preparing his filing for the Industrial Commission. (ECF No. 33-2 ¶¶ 4–6.) He also recounts his "experience of more than 30 years practicing worker's compensation law," in which he had

"seen mutually-agreed to settlements by unrepresented claimants," such as Mr. H, rejected by the Industrial Commission. (*Id.* ¶ 7.) Mr. Holmes then states that, after reviewing Mr. H's file in conjunction with his work before the Industrial Commission, he "did not think that a $200,000 settlement for Mr. H's claim was unreasonable." (*Id.* ¶ 8.) Mr. Holmes continues by stating what actions he would have taken if he thought the settlement was unreasonably low or too high. (*Id.* ¶¶ 9–10.)

Mr. Holmes only testifies as to his opinions that were formed as part of his handling of Mr. H's case before the Industrial Commission, because it is "part of [his] job to review the file and identify any issues" regarding the reasonability of the settlement. (ECF No. 33-2 ¶ 6.) Therefore, Mr. Holmes's declaration testimony is based on his "personal knowledge and perception" of his experience in handling Mr. H's case. *See MCI Telecomms.*, 897 F.2d at 706. Because Mr. Holmes's declaration offers lay witness opinion testimony pursuant to Rule 701, Eastern did not err by not designating him as an "expert" on their initial Rule 26 disclosures. *See Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 423 n.2 (M.D.N.C. 2005) ("The failure to identify a witness as an expert does not preclude the witness from testifying as a lay witness."). Accordingly, the Court will not strike the declaration of Jack Holmes.

Modern's motion to strike is therefore granted in part, as it relates to the declaration of Thomas French, (ECF No. 33-1), and denied in part, as it relates to the declaration of Jack Holmes, (ECF No. 33-2).

## III.   EASTERN'S MOTION IN LIMINE[4]

Eastern moves to exclude the testimony and report of William Senter, Modern's expert witness regarding the handling of Mr. H's claim, arguing that his report and testimony "are insufficiently reliable and are based on improper methodologies, *ipse dixit*, personal opinions, and the selective application of facts to the exclusion of contrary facts." (ECF No. 49 at 1–2.)  Modern asserts that Mr. Senter is "phenomenally qualified" and that Eastern's arguments regarding Mr. Senter's reliability are more appropriate for cross-examination. (ECF No. 57 at 2–3,11.)

Federal Rule of Evidence 702 requires the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  This "gatekeeping" obligation applies to all expert testimony under Rule 702, and not just the scientific testimony at issue in *Daubert*. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999).  The judge's evaluation of whether expert testimony is admissible under Rule 702 is "a flexible one," and the judge is given "broad discretion" in the determination of whether an expert's testimony is reliable. *See Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); *see also Kumho Tire*, 526 U.S. at 152.  "The proponent of the testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

---

[4] The Court recognizes that a Motion in Limine is generally reserved for trial; however, in the interest of justice and judicial economy, the motion, which has been fully briefed by the parties, will be addressed at this time.

"[W]here an expert relies on his experience and training and not a particular methodology to reach his conclusions, application of the *Daubert* analysis is unwarranted." *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n. 6 (4th Cir. 1997) (internal quotation marks and brackets omitted); *see also Kumho Tire*, 526 U.S. at 141 ("*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."). "Experiential expert testimony . . . does not rely on anything like a scientific method" and thus its admissibility is not tied necessarily to its scientific testability. *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (internal quotation marks omitted). When addressing an expert whose methodology is grounded in experience, courts use three factors: "1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied to the facts of the case." *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015); *see also Wilson*, 484 F.3d at 274.

William Senter is an attorney whose "primary areas of practice include plaintiff's workers' compensation, personal injury, mediations, and arbitration." (ECF No. 50-1 at 2.) Mr. Senter has practiced law in North Carolina since 1975 and has "mediated in excess of 5,000 cases as a plaintiff's attorney or a mediator," with a majority of those cases being workers' compensation cases. (*Id.*) He has represented "[p]robably" more than a hundred plaintiffs who had spine and neck injuries. (ECF No. 33-4 at 13.) Mr. Senter has not, however, "ever filed or defended an insurance bad faith case" and does not claim to be an expert in insurance claims handling. (*Id.* at 9.) He also does not claim to be an expert in "medical cost projecting." (*See id.* at 7–8.)

Mr. Senter's report offers opinions, according to Modern, "solely related to claim valuation and the Industrial Commission's approval process." (ECF No. 57 at 3–4.) The report states Mr. Senter's opinion is that "[a] reasonable settlement range for Mr. H's claim was between $75,000 to $125,000." (ECF No. 50-1 at 1.) The report further reasons that Mr. Berger's[5] initial estimate of Eastern's "total exposure at $414,470.50 was unrealistically high" and that "Mr. Berger's settlement strategy was not designed to obtain the lowest settlement." (*Id.*) The report concludes by stating that the "Industrial Commission rarely denies the approval of a submitted [settlement]" and that "[t]here [is] no harm to a future settlement in a case if the [Industrial Commission] rejects the initial propose[d] [settlement]." (*Id.*)

Eastern argues that Mr. Senter's report and testimony should be excluded "[b]ased on [his] lack of experience or knowledge about the handling of pro se claims, lack of experience in evaluating or forecasting medical costs," as well as his admissions that he is not an expert in insurance claims handling, medical forecasting, or insurance bad faith. (ECF No. 60 at 2-3.) This Court agrees.

While Mr. Senter makes it clear that he is not an expert on insurance claims handling, much of his discussion concerning Eastern's valuation of Mr. H's claim involves many of the nuances of claims handling. (*Id.* at 3.) In explaining his conclusion that Mr. Berger's valuation of Mr. H's claim was too high, Mr. Senter suggests, among other opinions, that: (1) Mr. Berger should have looked into Mr. H's prior medical history or pre-existing conditions to see whether the claim was compensable, or attributable to his on-the-job injury, (ECF No. 33-4 at 24–26); (2) Mr. H's intention not to get the recommended spinal surgery right away should

---

[5] Eastern's claim adjuster.

have lowered the settlement amount, (*id.* at 35–36); (3) Mr. H appeared motivated to settle the case, which could have led to a lower settlement amount, (*id.* at 39–40); and (4) Eastern should have "doctor shopped" to find a medical opinion that Mr. H's surgery was not needed, (*id.* at 45–46). Mr. Senter's opinions on Mr. H's claim valuation seem to be inextricably tied to his opinions regarding the reasonableness of how Eastern handled Mr. H's claim.[6] It is therefore unclear "how [Mr. Senter's] experience le[d] to [certain] conclusion[s] reached" in light of his lack of experience in insurance claim handling. *See SAS Inst.*, 125 F. Supp. 3d at 589.

Eastern also argues that Mr. Senter's experience cannot be reliably applied to the facts in this case because Mr. Senter lacks any experience dealing with *pro se* claimants before the Industrial Commission. (*See* ECF No. 60 at 2–3.) Mr. H's *pro se* status is important, Eastern argues, because "the standards the Industrial Commission . . . applies to settlements, the timeline of settlement offers, the length of successful settlement negotiations, and other key factors are significantly altered in relation to *pro se* claimants acting without the safeguards of legal representation." (*Id.* at 3.) In his deposition, Mr. Senter testified as to his lack of experience with *pro se* claimants:

> Q. In your experience—well you wouldn't have any experience representing *pro se* plaintiffs because they would have a lawyer.

---

[6] Mr. Senter's focus on the claims handling process in his conclusion regarding the final settlement amount is best shown by this exchange in his deposition:

> Q. [I]s it your opinion that Eastern's handling was wrong? And is it your opinion that Eastern's settlement range was wrong?
>
> A. My opinion is that in my experience Eastern made no effort that I can see to settle this case for a substantially lower amount.

(ECF No. 33-4 at 89–90.)

But as a mediator have you ever mediated cases with *pro se* workers?

A. I have.

Q. And did ultimately the Commission approve the settlement?

A. I don't keep up with that.

Q. Okay.

A. When I leave mediation I'm through.

. . .

Q. Okay, but you don't have any experience with unrepresented parties in the [I]ndustrial [C]ommission?

A. You mean as a rate of what gets kicked back and doesn't get kicked back?

Q. Yeah.

A. No.

(ECF No. 33-4 at 76–77.)  Mr. Senter also testified that he found it "a little unusual" that Mr. Berger was the first to make a settlement offer, because "[y]ou usually get a demand from a plaintiff before an adjuster makes an offer."  (*Id.* at 95–96.)  This opinion carries less weight, however, when considering that Mr. Senter has never been a part of a negotiation with an unrepresented claimant.  (*See id.* at 76–77.)  Therefore, Mr. Senter's conclusions that the "Industrial Commission rarely denies the approval of a submitted [settlement]" and "Mr. Berger's settlement strategy was not designed to obtain the lowest settlement," (ECF No. 50-1 at 1) are not reliably based on Mr. Senter's experience.

Moreover, Eastern argues that Mr. Senter's deposition testimony contradicted his opinions as stated in his expert report.  (ECF No. 60 at 8–9.)  Contradictory expert testimony

may be excluded due to a lack of reliability. *See, e.g.*, *Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 546 (S.D.W. Va. 2014), *as amended* (Oct. 29, 2014); *Richmond Med. Ctr. for Women v. Hicks*, 301 F. Supp. 2d 499, 510 (E.D. Va. 2004), *rev'd on other grounds sub nom. Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165 (4th Cir. 2009). Mr. Senter's report states that Mr. Berger's valuation of Eastern's "total exposure at $414,470.50 was unrealistically high." (ECF No. 50-1 at 1.) However, in his deposition, Mr. Senter states that Eastern could have "conceivably" been exposed to $414,000 in liability "or more." (ECF No. 33-4 at 74.) He also gives an example of how Eastern's exposure could be $175,000 *higher* than Mr. Berger's estimated $414,470.50 in exposure, if Mr. H "doesn't get back to work at all and they got to pay him for the rest of the 500 weeks" following surgery. (*Id.* at 69.) Moreover, Mr. Senter's inconsistent testimony demonstrates that his opinions on valuation—a subject about which he claims expertise—are unreliable and likely to confuse, rather than assist a finder of fact. *See* Fed. R. Evid. 702(a) (explaining that expert testimony is only appropriate where it "will help the trier of fact to understand the evidence or to determine a fact in issue"). Nor are the cases cited by Modern, in support of its argument that this Court should allow Mr. Senter's expert testimony, persuasive.

In ruling on a motion to exclude the testimony of an expert witness, the trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. This Court concludes that Modern has not shown by a preponderance of the evidence that Mr. Senter's experience, and therefore his proffered testimony, can be reliably applied to the facts of this case. *See Wilson*, 484 U.S. at 274; *Cooper*, 259 F.3d at 199.

The Court will therefore grant Eastern's Motion in Limine to Exclude Testimony and Report of William Senter, (ECF No. 49).

## IV.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted). The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When reviewing a motion for summary judgment, the court must view the evidence and "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

In cases where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted)).

In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). The nonmoving party must support its assertions by citing to particular parts of the record, or by showing that the materials cited do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324. The judicial inquiry on summary judgment "thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## B. Discussion

In its Complaint, Modern states four causes of action concerning Eastern's handling of the claims of Mr. G, Mr. H, and Mr. S: (1) breach of contract, (ECF No. 4 ¶¶ 80–86); (2) negligent claims handling, (*id.* ¶¶ 87–90); (3) unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 58-63-15(11), (*id.* ¶¶ 91–100); and (4) unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1, (*id.* ¶¶ 101–107). The Court will address the above causes of action in order, addressing the final two causes of action together.

### 1. *Breach of Contract*

#### a. *Mr. G*

Mr. G was injured in April 2015. (ECF No. 4 ¶ 20.) Modern settled Mr. G's claim in March 2016. (ECF No. 39-2 ¶ 6.) Although Modern had expressed its strong preference that

Eastern obtain a "release and resignation"[7] as part of Mr. G's settlement, (ECF No. 33-3 at 95–97), Eastern did not obtain a release and resignation along with its settlement of Mr. G's claim, (*id.* at 100.)  The Policy does not require Eastern to obtain a release and resignation as part of its settlement process.  (*Id.* at 98; *see* ECF No. 4-1.)

Modern argues that Eastern breached the Policy by failing to obtain a release and resignation from Mr. G as part of its settlement of his workers' compensation claim.  (ECF No. 39 at 11–12.)  Eastern argues that it was not required by the Policy to obtain a release and resignation as part of every settlement.  (ECF No. 33 at 12–13.)  Modern counters that, although the duty to obtain a release and resignation was not explicitly stated in the Policy, the Court is permitted to consider parol evidence to interpret the Policy as requiring a release and resignation.  (ECF No. 39 at 11.)

An insurance policy is a contract, and "its provisions govern the rights and duties of the parties thereto."  *Fidelity Bankers Life Ins. Co. v. Dortch*, 348 S.E.2d 794, 796 (N.C. 1986).  "As with all contracts, the goal of construction is to arrive at the intent of the parties when the policy was issued."  *Woods v. Nationwide Mut. Ins. Co.*, 246 S.E.2d 773, 777 (N.C. 1978).  "In construing an insurance policy, 'nontechnical words, not defined in the policy, are to be given the same meaning they usually receive in ordinary speech, unless the context requires otherwise.'"  *Brown v. Lumbermens Mut. Cas. Co.*, 390 S.E.2d 150, 153 (N.C. 1990) (quoting *Grant v. Emmco Ins. Co.*, 243 S.E.2d 894, 897 (N.C. 1978)).  Further, "ambiguity in the terms of an

---

[7] A "release and resignation" is where, as a part of the settlement process, the employee agrees to resign and be released from his position in exchange for a certain amount of money.  (ECF No. 39-3 at 65.)

insurance policy is not established by the mere fact that the plaintiff makes a claim based upon a construction of its language" which the insurance company disputes. *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970). Instead, ambiguity only exists if "the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend."[8] *Id.* "[I]f the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written." *Woods*, 246 S.E.2d at 777.

Modern argues that the phrase "duty to defend" is not defined in the Policy and is therefore ambiguous. (ECF No. 39 at 11.) An insurer's "duty to defend," is a common feature of insurance contracts. *See generally* 3 New Appleman on Insurance Law § 17.01 *et seq.* (2019). The "duty to defend" is generally understood to mean the insurance company's duty to hire counsel to defend the insured in a suit brought by a third-party. *See Auto-Owners Ins. Co. v. Potter*, 242 F. App'x 94, 99–100 (4th Cir. 2007) (explaining that withdrawal of counsel representing the insured may represent a breach of the duty to defend); *Bruce-Terminix Co. v. Zurich Ins. Co.*, 504 S.E.2d 574, 576–78 (N.C. Ct. App. 1998) (explaining that, after the plaintiff's insurance companies denied their duty to defend, the plaintiff had to "hire[ ] counsel to represent its interests in" a third-party suit). The "duty to defend" ends when a settlement or judgment is reached, unless the parties have contracted otherwise. *See Brown v. Lumbermens Mut. Cas. Co.*, 369 S.E.2d 367, 374 (N.C. Ct. App. 1988), *aff'd*, 390 S.E.2d 150, 151 (N.C. 1990) (interpreting an ambiguous duty to defend to end upon a final settlement or judgment, not

---

[8] "The trial court's determination of whether the language of a contract is ambiguous is a question of law." *Salvaggio v. New Breed Transfer Corp.*, 564 S.E.2d 641, 643 (N.C. Ct. App. 2002) (quoting *Bicket v. McLean Sec., Inc.*, 478 S.E.2d 518, 521 (N.C. Ct. App. 1996)).

once the insurer has paid out to its policy limit). Modern does not point to any other portion of the Policy that would extend the scope of the duty to defend beyond settlement of the claims against it and does not explain why Eastern's "duty to defend" is ambiguous beyond noting that the Policy does not define "defend." (ECF No. 39 at 11–12.) This Court does not find the "duty to defend," as stated in the Policy, ambiguous. Because "only one reasonable interpretation exists," *Woods*, 246 S.E.2d at 777, the Court will decline to interpret the Policy's "duty to defend" as requiring Eastern to obtain a release and resignation with every settlement. Further, because the language of the contract is unambiguous, the parol evidence rule prevents the Court from considering the statements made during the negotiation of the Policy in which Modern contends that it expressed its desire to "always" secure a resignation and release. *See Thompson v. First Citizens Bank & Tr. Co.*, 567 S.E.2d 184, 188 (N.C. Ct. App. 2002); (ECF No. 39-1 at 6–8). Accordingly, because Modern has failed to show that a genuine issue of material fact exists regarding Eastern's handling of Mr. G's claim, Eastern is entitled to summary judgment as a matter of law as to Modern's breach of contract claim regarding Mr. G's claim.

### b. Mr. H

Mr. H suffered a spinal injury in October 2015. (*See* ECF No. 4 ¶ 31; ECF No. 33-7 at 7–8.) One of the physicians that Mr. H saw recommended a spinal fusion surgery which would force Mr. H to be out of work for four to six weeks and face a maximum total of six months of recovery. (*See* ECF No. 33-7 at 7–8.) Modern and Eastern were initially prepared to settle by paying for Mr. H's surgery and recovery costs and allowing Mr. H to return to work for Modern in a light-duty role. (*See id.* at 9.) Approximately one week before Mr. H

was scheduled to have his surgery, however, Mr. H informed Eastern that he wished to settle for a lump sum instead.  (ECF No. 33-7 at 2.)

After reviewing Mr. H's file, Eastern's insurance adjuster, Jeffrey Berger, estimated the potential cost of Mr. H's case to be approximately $414,740.50, including present and future medical costs, vocational rehabilitation, and disability payments.  (*Id.* at 4.)  He also estimated, "based [o]n past history," that the North Carolina Industrial Commission would not approve of a settlement below $200,000 for this case.  (*Id.*)  When Mr. Berger informed Modern's general counsel, Mike Feiereisel, that he anticipated a settlement of around $225,000, Modern disagreed, stating that $125,000 would be a more appropriate figure. (*Id.*; ECF No. 33-3 at 79.) Mr. Berger first offered Mr. H $175,000 as a settlement, and finally agreed on a settlement of $200,000.  (ECF No. 33-7 at 2–3; ECF No. 39-3 at 79–80.)

Eastern argues that it is entitled to summary judgment because it "investigated and settled" Mr. H's claim "within [the] policy limits," pursuant to the terms of the Policy.  (ECF No. 33 at 11–12.)  Eastern argues further that it satisfied its duty of good faith by settling the case within the policy limits.  (ECF No. 33 at 8–9.)  Modern argues that Eastern breached the Policy by "put[ting] its interests ahead of Modern's when it settled Mr. H's case for an excessive amount."  (ECF No. 39 at 15 (emphasis omitted).)

"The law imposes on the insurer the duty of carrying out in good faith its contract of insurance[,]" including the insurer's "right to effectuate settlement." *Alford v. Textile Ins. Co.*, 103 S.E.2d 8, 12 (N.C. 1958); *see also Robinson v. N.C. Farm Bureau Ins. Co.*, 356 S.E.2d 392, 395 (N.C. Ct. App. 1987) ("An insurance company is expected to deal fairly and in good faith with its policyholders.").  Insurance companies and their agents do not, however, "act as agents for

the insured when settling claims." *Hatcher v. Flockhart Foods, Inc.*, 589 S.E.2d 140, 142 (N.C. Ct. App. 2003) (citation omitted). The North Carolina Court of Appeals has held:

> that a cause of action alleging breach of good faith will not lie when the insurer settles a claim within the monetary limits of the insured's policy; however, in doing so, we believe the insurer has the duty to consider the insured's interest. In so holding, we recognize that an insurer may act in its own interest in settlement of the claim.

*Cash v. State Farm Mut. Auto. Ins. Co.*, 528 S.E.2d 372, 380 (N.C. Ct. App. 2000) (citations omitted). Other states that have addressed this issue have similarly found that an insurer that settles a claim within the policy limits generally acts in good faith. *See Doe v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n,* 557 S.E.2d 670, 675 (S.C. 2001) (holding that an insurance company that settled within the policy limits acted in good faith); *Shuster v. S. Broward Hosp. Dist. Physicians' Prof'l Liab. Ins. Tr.*, 591 So. 2d 174, 177 (Fla. 1992) (explaining that an insurer who settles within its policy limit does "exactly what the parties contemplated," and so does not act in bad faith); *Marginian v. Allstate Ins. Co.*, 481 N.E.2d 600, 603 (Ohio 1985) (holding that "a cause of action alleging a breach of the insurer's duty of good faith" will not lie where the insurer has permission to settle any claim and does so within its monetary limits). Although North Carolina courts do consider whether a settlement is made within the policy limits, in settling a claim, the insurer "has the duty to consider the insured's interest." *Cash*, 528 S.E.2d at 380.

Modern's main argument against the reasonableness of Mr. H's settlement is that Eastern paid too much.[9] Mr. Berger's claim notes show that Mike Feiereisel, Modern's general

---

[9] Modern also appears to argue that Eastern was unreasonable when it denied Mr. H's scheduled surgery. (ECF No. 39 at 15–17.) Although Mr. Berger did withdraw Eastern's approval for Mr. H's

counsel, believed that $125,000 was an appropriate settlement amount, (ECF No. 33-7 at 4–5), and Mr. Feiereisel, in his deposition, states that he believed that $75,000 was an appropriate settlement amount, (ECF No. 33-3 at 126–28). Mr. Burger, however, estimated Eastern's total exposure as $414,740.50 and recommended a settlement "for up to $225,000–$230,000." (ECF No. 33-7 at 4.) Mr. Burger also estimated that because "the injured worker is not represented, the [Industrial] Commission would not approve a settlement on this file unless we are paying $200,000 or more based [o]n past history." (*Id.*) Jack Holmes, the North Carolina attorney who represented Eastern before the Industrial Commission for Mr. H's claim, stated that "[w]hen [he] reviewed the file in this matter, . . . [he] did not think that a $200,000 settlement for Mr. H's claim was unreasonable." (ECF No. 33-2 ¶ 8.) Further, Henry C. Byrum, Jr. an expert witness proffered by Eastern, wrote in his report that a settlement of $200,000 was "entirely reasonable." (ECF No. 57-5 at 4.)

Modern also takes issue with the fact that, by settling Mr. H's claim for $200,000, Eastern spent "$200,000 of Modern's money (entirely within Modern's deductible)" while "Eastern's risk and costs were eliminated." (ECF No. 39 at 17.) That fact alone, however, cannot support a breach of contract claim for failure to settle Modern's claim in good faith. *See Cash*, 528 S.E.2d at 380. To avoid summary judgment, Modern must "rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the

---

scheduled surgery on September 1, 2016, (ECF No. 33-7 at 2), that was in accordance with Mr. H's wishes, (*see id.* at 5). Mr. Berger only withdrew Eastern's approval of the surgery once Mr. H expressed his interest "in a settlement rather than go[ing] through with a 3[-]level cervical fusion [surgery]" and the parties had agreed to a settlement of $200,000. (*Id.* at 2, 5.) Because Mr. H no longer wished to undergo the surgery at that time, Modern has failed to show how Eastern breached its duty of good faith by agreeing to a settlement and not forcing Mr. H to undergo the surgery.

mere existence of a scintilla of evidence." *See Dash*, 731 F. 3d at 311. Modern has thus failed to raise a genuine issue related to its claim that Eastern breached the Policy by failing to consider Modern's interest in settling Mr. H's case for $200,000. *Cash*, 528 S.E.2d at 280. Defendant is therefore entitled to judgment on this claim as a matter of law.

       *c. Mr. S*

Mr. S was injured in February 2015, (ECF No. 4 ¶ 58), and his claim was settled in October 2016, (*see* ECF No. 39-2 at 7). As part of the settlement, Modern agreed to waive its right to a meritorious third-party negligence claim and allow Mr. S to keep those proceeds, valued at $40,000. (ECF No. 39-2 at 7; ECF 4 ¶ 59.) In exchange, Modern was told that Mr. S agreed to pay a required amount of $11,699 to a Medicare Set Aside fund ("MSA").[10] (ECF No. 39-2 at 7; ECF No. 4 ¶ 59.) Modern was informed approximately two months later, however, that the "'payback' situation did not work out," and that Modern would be responsible for over $5,000 for the MSA. (ECF No. 39-2 at 3–4, 8.) Modern was not contacted regarding this change in Mr. S's settlement before the bill was issued. (*Id.* ¶ 13.) As a result, Modern argues that Eastern did not handle Mr. S's claim in good faith because it "g[a]ve away over $5,000 of Modern's money without any communication with Modern." (ECF No. 39 at 15.)

---

[10] Medicare Set Aside funds require injured workers to direct a portion of their workers' compensation settlement into a fund—the Set Aside fund—and further require the worker to exhaust these funds before Medicare will pay for any future medical treatment related to their work-related injury, illness or disease. *See Worker's Compensation Medicare Set Aside Arrangements*, CMS.gov, https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Workers-Compensation-Medicare-Set-Aside-Arrangements/WCMSA-Overview.html (last visited Sept. 23, 2019).

Modern appears to focus its critique of Eastern's handling of Mr. S's claim on the lack of communication regarding the change of settlement terms. (*See* ECF No. 39 at 14–15; ECF No. 39-2 ¶ 15 ("[Mr. Feiereisel] was in the office and available during business hours from October 16 to December 14 most days. There was nothing preventing Eastern from communicating with [him] during those times.").) Modern does not, however, argue or provide support for the proposition that an insurer owes any particular duty to communicate with its insured throughout the settlement process and update the insured on any material changes. (*See* ECF No. 39.) Because there is no independent duty to communicate and update the insured of material changes which occur during the settlement process, Eastern's handling of Mr. S's settlement is judged by the same "duty to consider the insured's interest" as was the case in Mr. H's claim. *See Cash*, 528 S.E.2d at 380.

Modern argues that Eastern failed to consider its interests when it improperly considered the fact that Modern did not renew its policy with Eastern when settling Mr. S's claim. (ECF No. 39 at 15.) In support of this argument, Modern points to an email between Robert Carl, a "Subrogation Claim Representative" from Eastern and Mr. Feiereisel. (*Id.*; ECF No. 39-4 at 23.) Attached to that email, it appears that Mr. Carl wrote, in a yellow highlighted text box, "insd no longer with EAIG." (ECF No. 39-4 at 17–18, 23 (explaining that quote to mean that Modern was no longer insured by Eastern).) It is not explained in the record, however, how or why that yellow box was attached to the email or the role of Mr. Carl in Mr. S's settlement. Modern cannot satisfy its burden to avoid summary judgment by engaging in "mere speculation" or "the building of one inference upon another." *Dash*, 731 F.3d at 311.

Accordingly, the Court will grant Eastern's motion for summary judgment with respect to its breach of contract claim regarding the handling of Mr. S's settlement.

## 2. Negligent Claims Handling

Eastern next seeks summary judgment related to Modern's second cause of action for negligent claims handling. (ECF No. 4 ¶¶ 87–90.) Modern's claim alleges that Eastern negligently handled Modern's workers' compensation claims, most importantly by refusing to provide the insured with copies of relevant files. (*See id.*) Eastern argues that this claim fails as a matter of law because Plaintiff raises no genuine issue entitling it to an exception to the economic loss rule. (ECF No. 33 at 13–16.) Further, Eastern argues that even if this Court concludes that the economic loss rule does not bar Modern's claim, any negligence by Defendants is barred due to Plaintiff's own contributory negligence. (*Id.* at 16–17.) Modern argues that an exception to the economic loss rule does apply and that "it would be improper for the Court to grant summary judgment against Modern's negligence claim surrounding Eastern depriving Modern of its file from Modern's own attorney." (ECF No. 39 at 20–22.)

As previously recognized by this Court, the economic loss rule provides that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 240 S.E.2d 345, 350 (N.C. 1978), *abrogated in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.*, 328 S.E.2d 274 (N.C. 1985). This is true even where the failure to perform the contract is due to the negligent or intentional conduct of the party and the injury resulting from the breach is the subject of the contract. (*See id.* at 350–51.) The economic loss rule, does however, include four exceptions under which a promisee may support a tort action against a promisor. (*Id.*)

Of these four exceptions only the fourth exception has potential applicability here, (ECF No. 18 at 11), which the parties each address in their respective briefs. (ECF No. 33 at 14–16; ECF No. 39 at 20–22.) Under the fourth exception, "a promisee may sue a promisor for the negligent performance of a contract" where such promisee can show that the injury was willful or "a conversion of the property of the promisee, which was the subject of the contract." *Mason v. Yontz & Sons*, 403 S.E.2d 536, 538 (N.C. Ct. App. 1991); *Ports Auth.*, 240 S.E.2d at 350–51.

Modern argues that the fourth exception to the economic loss rule applies on the facts of this case under a conversion theory based on the allegation that EAIC refused to provide the insured with a copy of its files and directed McAngus not to turn over the files to Modern. (ECF No. 39 at 20–22.) While such allegations may have been sufficient to allow the claim to survive at the motion to dismiss stage, at this stage Modern must produce sufficient evidence that such conversion occurred; that the property converted is the property of Modern; and that the property converted is the subject of the contract between Eastern and Modern. A failure on any one of these elements will bar Modern's tort claim. *See Mitchell*, 12 F.3d at 1316 ("The summary judgment inquiry . . . scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial.").

Eastern argues that the fourth exception to the economic loss rule does not apply because (1) the claim files are not the subject of the parties' contract; (2) Defendants' temporary retention of the files was under a claim of right and so was not wrongful and,

therefore, not conversion; and (3) Modern was contributorily negligent. (ECF No. 33 at 13–16.)

First, Modern's brief is completely silent on Eastern's contention that the claim files are not the subject of the parties' contract. Nor does Modern address at all this element of its claim. (*See* ECF No. 39 at 20–22.) The parties' contracts in this case are the Policy and the Deductible Agreement. Modern offers no evidence or other support to show that the claims files sought by Modern are the "subject of the contract" between Modern and Eastern—a requirement for its negligence claim to go forward under the fourth exception to the economic loss rule. *See Ports Auth.*, 240 S.E.2d at 350–51. Typically, "a party's failure to address an issue in its opposition brief concedes the issue." *Oliver v. Baity*, 208 F. Supp. 3d 681, 690 (M.D.N.C. 2016) (collecting cases). Moreover, Modern has not provided sufficient evidence that Eastern engaged in conversion of the claim files or directed McAngus not to turn over the files. The North Carolina Supreme Court has held that the claim of conversion has "two essential elements," the "ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 747 (N.C. 2012). Modern points to the following evidence in the record to support its theory of conversion by Eastern: (a) that Modern requested the claim files of Mr. H and Mr. S from both McAngus and Eastern, (ECF No. 39 at 20–21); (b) that Modern did not receive the files in question from McAngus until approximately five months after its initial request, on September 30, 2016 and then only once it had filed this suit, (*id.*); (c) that following Modern's initial request for the files from McAngus, conversations transpired between McAngus and Eastern though Modern was not able to show the contents of this conversation, (*id* at 21); (d)

that a conversation between Eastern and Eastern's Pennsylvania attorney on December 14, 2016 about privilege related to the files, (*id.*); and (e) that Eastern eventually made a statement that it did not oppose Modern receiving the files, although it did not know when it reached that conclusion, (*id.*).  Based on this evidence Modern argues that Eastern depriving Modern of its attorney files, in violation of Rule 245 of the North Carolina Rules of Professional Conduct,[11] is wrongful and therefore is conversion.  (ECF No. 39 at 22.)  This argument fails for two reasons.  First, Modern's evidence is not sufficient to show that Eastern deprived Modern of its attorney files.  Second, Rule  245 cited by Modern may impose a duty upon an attorney; however, Modern has failed to demonstrate that that it imposes such a duty on Eastern, thus making Eastern's actions wrongful.

Taking the evidence pointed to by Modern in the light most favorable to Modern and resolving all inferences in its favor, Modern has failed to point to sufficient evidence in the record for a reasonable juror to find that Eastern has engaged in conversion of the files in question.  *See Mitchell*, 12 F.3d at 1316.  Thus, Modern, having failed to establish two essential components of the fourth exception to the economic loss rule, the rule applies, and Modern's negligent mishandling claim is barred.

Accordingly, Eastern is entitled to judgment as a matter of law and thus its motion for summary judgment related to Modern's second cause of action for negligent claims mishandling will be granted.

---

[11]  The rule provides in pertinent part: "A lawyer in possession of the legal file relating to the prior representation of co-parties in an action must provide the co-party the lawyer does not represent with access to the file and a reasonable opportunity to copy the contents of the file."  N.C. R. Prof'l Conduct 245.

*Unfair and Deceptive Trade Practices pursuant to N.C. Gen. Stat. §§ 58-63-15(11), 75-1.1*

Modern's third and fourth causes of action are unfair and deceptive trade practices claims. (ECF No. 4 ¶¶ 91–107.) The third cause of action is alleged pursuant to sections 58-63-15(11) and 75-1.1 of the North Carolina General Statutes, and the fourth cause of action is alleged solely pursuant to section 75-1.1. (*Id.*) To state a prima facie claim for unfair or deceptive trade practices pursuant to section 75-1.1, "a plaintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013) (alteration in original) (quoting *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001)). Section 58-63-15 of the North Carolina General Statutes enumerates certain practices "as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." N.C. Gen. Stat. § 58-63-15. North Carolina courts have held that these practices enumerated in § 58-63-15(11) are "unfair or deceptive acts or practices," which are prohibited under § 75-1.1(a). *Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 683 (N.C. 2000); *Country Club of Johnston Cty., Inc. v. U.S. Fid. & Guar. Co.*, 563 S.E.2d 269, 279 (N.C. Ct. App. 2002). Thus, North Carolina law extends a private right of action to an insured whose insurer has committed a prohibited practice enumerated in § 58-63-15(11). *See, e.g., Country Club of Johnston Cty.*, 563 S.E.2d at 279–80.

With respect to Mr. G's claim, Modern argues that Eastern's failure to notify Modern when it agreed to a settlement violated sections 58-63-15(11)(b) and 75-1.1.[12] (ECF No. 39 at

---

[12] Modern also argues that "Eastern . . . violated [section] 58-63-15(1) when it misrepresented that it would obtain releases and resignations in connection with settlements." (ECF No. 39 at 14.) Modern

13.)  Eastern's claim notes show that Eastern and Mr. G agreed to a settlement on February 29, 2016.  (ECF No. 39-2 at 5.)  On March 11, 2016, an Eastern representative left a voicemail with Mr. Feiereisel "to advise that [Mr. G's claim] is moving forward for settlement."  (*Id.*) The settlement was then submitted to the Industrial Commission on March 29, 2016.  (*Id.*) One and a half months later, on May 17, 2016, Mr. Feiereisel emailed Eastern when he noticed a "large charge on this month's statement for [Mr. G]" and asked whether the claim had settled.  (*Id.* at 6.)  A representative from Eastern replied within twenty minutes to say that it had settled, the amount it settled for, and the type of settlement.  (*Id.*)

Modern argues that this conduct shows that Eastern violated section 58-63-15(11)(b), which prohibits an insurance company from "failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies."  N.C. Gen. Stat. § 58-63-15(11)(b).  Modern does not, however, point to any "communications" to which Eastern "[f]ail[ed] to acknowledge and act reasonably promptly."  *Id.*; (ECF No. 39 at 12–13).  Instead, Modern appears to interpret the statute as creating a duty for the insurer to provide the insured with periodic updates throughout the settlement process.  (ECF No. 39 at 12–13.)  Modern does not point to, and this Court does not find, any authority creating such a duty for Eastern.  Modern has therefore failed to point to sufficient facts in the record to show a violation of subsection (b).

---

does not, however, plead a cause of action arising under subsection (1) in its Complaint.  (*See* ECF No. 4 ¶¶ 91–100 (citing N.C. Gen. Stat. §§ 58-63-15(11) and 75-1.1).)  Because "a party may not use its briefs in support of or opposition to summary judgment to amend a complaint," *Hexion Specialty Chems., Inc. v. Oak-Bark Corp.*, No. 7:09-CV-105-D, 2011 WL 4527382, at *7 (E.D.N.C. Sept. 28, 2011), the Court will not consider Modern's attempted claim pursuant to section 58-63-15(1).

Modern also argues that Eastern violated section 75-1.1 because "Eastern's conduct amounts to an inequitable use of power." (ECF No. 39 at 13.) Modern points to a note that appears in Eastern's claim file for Mr. G which states, "We [Eastern] no longer have coverage for Insured and therefore it is in our best interest to settle full and final eliminating all future exposure." (ECF No. 39-3 at 89.) Modern argues that this note, in addition to Eastern's failure to obtain a resignation and release as part of Mr. G's settlement, amounts to an unfair and deceptive act. (ECF No. 39 at 13.) As discussed with respect to Modern's breach of contract claim, "an insurer may act in its own interest in settlement of the claim." *Cash*, 528 S.E.2d at 380. Evidence that Eastern considered its own interests in settling Mr. G's claim, such as the above-referenced note, does not amount to an unfair and deceptive act. *See id.*

With respect to Mr. H's claim, Modern does not specify any particular subsection of section 58-63-15(11) that Eastern violated. (ECF No. 39 at 17.) Instead, Modern argues that "Eastern's admission in its claim files that it was aware of and considering both Modern's deductible amount and the fact that Modern had terminated its relationship with Eastern" shows that Eastern was engaged in unfair and deceptive business practices. (ECF No. 39 at 17.) Both of the occurrences Modern appears to reference, however, occurred in relation to Mr. G and Mr. S, not Mr. H. (*See* ECF No. 39-3 at 62–63, 89 (Eastern noting in connection to Mr. G's claim that Modern was no longer insured by Eastern); ECF No. 39 at 15; ECF No. 39-4 at 23 (Eastern noting in connection to Mr. S's claim that Modern was no longer insured by Eastern).) Those two occurrences, therefore, would not create a genuine issue of any material fact as to whether the handling of Mr. H's claim constituted a violation of sections 58-63-15(11) or 75-1.1.

With respect to Mr. S's claim, Modern essentially restates its claim for breach of contract. (*See* ECF No. 39 at 14–15.) Modern argues that Eastern violated section 58-63-15(11)(a), which prohibits "[m]isrepresenting pertinent facts . . . relating to coverages at issue," by settling the case for over $5,000 more than it originally told Modern. (ECF No. 39 at 14–15.) Modern again appears to misinterpret the statute at issue: the alleged misrepresentations of which Modern complains relate to the terms of a settlement, not the "coverages at issue." (*Id.*); *see, e.g.*, *Nelson v. Hartford Underwriters Ins. Co.*, 630 S.E.2d 221, 230–32 (N.C. Ct. App. 2006) (addressing a claim pursuant to section 58-63-15(11)(a) regarding a dispute over a denial of coverage). Modern has not presented any evidence regarding a dispute over the coverage of Mr. S's claim. (*See* ECF No. 39 at 14–15.) Therefore, summary judgment is appropriate as to Mr. S's claim.[13]

Having addressed the three underlying workers' compensation claims which form the basis of Modern's allegations, this Court does not find that Modern has set forth sufficient evidence to create a genuine issue as to whether a reasonable juror could find violations of section 58-63-15(11)[14] or section 75-1.1. Accordingly, Eastern is entitled to summary judgment as a matter of law with respect to Modern's third and fourth causes of action.

---

[13] To the extent that Modern argues that Eastern violated section 58-63-15(11)(b) by "communicat[ing] horribly," (ECF No. 39 at 15), such a claim fails for the same reasons as its section 58-63-15(11)(b) claim related to Mr. G. Modern does not identify any "communication" that Eastern failed to "acknowledge" or to respond to "reasonably promptly." N.C. Gen. Stat. § 58-63-15(11)(b).

[14] Modern's complaint alleges violations of three other violations of section 58-63-15(11). (ECF No. 4 ¶ 96(c)–(e).) Because Modern does not address these in its brief and this Court, after review of the record, does not find any violations of those subsections, the Court will grant summary judgment as to those subsections as well. *See Oliver*, 208 F. Supp. 3d at 690 ("Courts have recognized that a party's failure to address an issue in its opposition brief concedes the issue.").

## V. CONCLUSION

In reviewing the parties' evidentiary motions, the Court first grants Modern's motion to strike as it related to the declaration of Thomas French and denies the motion to strike as it related to the declaration of Jack Holmes. Second, the Court grants Eastern's motion to exclude the testimony and report of Mr. Senter, Modern's expert. Third, Modern has failed to demonstrate a genuine issue of any material fact as to all claims, which include Modern's breach of contract claim as it relates to the settlement of Mr. H, Mr. G's and Mr. S's workers' compensation claims, its negligent claims handling claim, and its two unfair and deceptive trade practices claims. Accordingly, summary judgment is appropriate as to all of Modern's claims.

For the reasons outlined herein, the Court enters the following:

**[ORDER TO FOLLOW ON NEXT PAGE]**

## ORDER

IT IS THEREFORE ORDERED that Plaintiff's Motion to Strike, (ECF No. 35), is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED as to the Declaration of Thomas A. French, (ECF No. 33-1), and DENIED as to the Declaration of Jack S. Holmes, (ECF No. 33-2).

IT IS FURTHER ORDERED that Defendants' Motion in Limine is GRANTED, (ECF No. 49), and the Court excludes the testimony and report of Plaintiff's expert.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment, (ECF No. 32), is GRANTED as to all claims, and all claims are hereby DISMISSED WITH PREJUDICE.

This, the 23rd day of September 2019.

/s/ Loretta C. Biggs
United States District Judge